[Cite as *State v. Glenn*, 2011-Ohio-543.]

STATE OF OHIO, MAHONING COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO | ) | CASE NO. 09 MA 54 |
| | ) | |
| PLAINTIFF-APPELLEE | ) | |
| | ) | |
| VS. | ) | OPINION |
| | ) | |
| DEON GLENN | ) | |
| | ) | |
| DEFENDANT-APPELLANT | ) | |

CHARACTER OF PROCEEDINGS:       Criminal Appeal from the Court of
                                Common Pleas of Mahoning County,
                                Ohio
                                Case No. 07 CR 696

JUDGMENT:                       Affirmed.

APPEARANCES:

For Plaintiff-Appellee:         Atty. Paul J. Gains
                                Mahoning County Prosecutor
                                Atty. Ralph M. Rivera
                                Assistant Prosecuting Attorney
                                21 West Boardman Street, 6th Floor
                                Youngstown, Ohio  44503

For Defendant-Appellant:        Atty. J. Dean Carro
                                Director Legal Clinic
                                University of Akron
                                School of Law
                                Office of Appellate Review
                                Akron, Ohio  44325-2901

JUDGES:

Hon. Cheryl L. Waite
Hon. Joseph J. Vukovich
Hon. Mary DeGenaro

                                Dated:  February 4, 2011

WAITE, P.J.

**{1}** Appellant, Deon Glenn, appeals the judgment entry of the Mahoning County Court of Common Pleas convicting him on one count of murder, in violation of R.C. 2903.02(A)(D), a felony of the first degree (a lesser included offense of the original charge of aggravated murder), five counts of attempted murder, in violation of R.C. 2903.02(A)(D), felonies of the first degree, and six firearm specifications pursuant to R.C. 2941.146(A).

**{2}** According to the testimony at trial, Appellant, while riding in the front-passenger seat of a car on the north side of Youngstown, drew a .380 caliber semi-automatic handgun and fired approximately five shots at a group teenagers walking from a block party on May 25, 2007. One of the teenagers, Maressia Patterson, was fatally wounded. Another, Akeem Minor, was shot in the leg. The other five high school students, Raheem Minor, Hanibol Minor, Dewaylon Green, Kenny Bullock and Maurice McQueen, escaped without injury.

**{3}** Appellant contends that there was insufficient evidence to prove that he purposely or voluntarily caused Patterson's death or attempted to cause the death of the other high school students based on the random pattern of gunshots. In the alternative, he argues that the manifest weight of the evidence proves that he did not purposely or voluntarily cause Patterson's death or attempt to cause the death of the other students based on the random pattern of the gunshots and the combination of stimulants and depressants in his system that evening. For the following reasons, both of Appellant's assignments of error are overruled and his conviction is affirmed.

**{4}** According to his testimony at trial, Appellant bought a HiPoint .380 semi-automatic pistol three days before the shootings to protect himself, his home, and family. (Tr., pp. 798-799.) He was walking home from Life Skills, a charter school catering to at-risk students in the city, and was approached by a neighborhood acquaintance who offered to sell him the gun and ammunition for $80. The gun was loaded when he purchased it. (Tr., p. 823.)

**{5}** Appellant considered himself a part of a group of students, mainly from Chaney High School, who referred to themselves as "BMF," an abbreviation for "[b]itches, money, fame." (Tr., pp. 343, 802.) BMF was not a criminal enterprise, they were a group of friends who tried to be "the life of the part[y]," and engaged in dance-offs with other groups. (Tr., pp. 343, 802.) One such group was comprised of students, mainly from the Rayen School, who referred to themselves as "BBH," an abbreviation for "[b]rothers before hoes." (Tr., pp. 342, 382.) Like "BMF," "BBH" had no criminal purpose, they were a group of friends who enjoyed flaunting their style and dancing ability. (Tr., pp. 382, 551.)

**{6}** The two groups conversed and occasionally "trash talk[ed]" on MySpace. (Tr., 383.) However, the testimony at trial established that the rivalry between the groups was not always friendly. Hanibol Minor testified that the MySpace exchanges were intended to incite violence, even though Raheem Minor testified that this was not the main thrust of the dialogue. (Tr., pp. 344, 384.) Bullock testified that a dispute existed between the two groups that began at a party a few months before the shooting. (Tr., p. 581.) Raheem Minor admitted that there were

problems between his twin brother, Akeem, and Robert Jackson (Tr., p. 344.) Jackson testified that he had some disputes with the Minors, but they had been resolved. (Tr., p. 451.) According to Jackson, he talked to the Minors and they agreed that it was childish to fight every time they saw one another. After that discussion, they had attended a prom after-party without any problems. (Tr., p. 451.)

{7} On May 25, 2007, Jackson called Appellant to invite him to attend a party on the north side of the city. (Tr., p. 809.) Appellant testified that he took the handgun to the party for his own safety even though he was not expecting any trouble. (Tr., p. 810.) Jackson picked up Deandre Brooks and Braylyn Williams on the way to the party. (Tr., p. 811.)

{8} The young men stopped at a gas station where Appellant purchased three Rockstar energy drinks. (Tr., p. 813.) Appellant said he consumed these drinks at the party, in addition to a styrofoam cup full of Hennessy, a cognac. He also smoked one-half of a six inch cigar emptied of tobacco and filled with marijuana. (Tr., pp. 815-817.) Appellant testified that he was "not a smoker or a drinker," but that he had tried marijuana "probably one time" in the past. (Tr., pp. 818-819, 865.) He further stated that he never consumed alcohol prior to that evening. (Tr., p. 818.)

{9} According to Appellant, he did not know Patterson, and did not see her, the Minor brothers, Bullock, or McQueen at the party. (Tr., p. 819.) He testified that he did not know the meaning behind the abbreviation "BBH" until the police told him the day after the shooting. (Tr., p. 861.) Appellant further testified that the party broke up when police arrived on the scene after gunshots were fired. (Tr., p. 822.)

{10} According to his testimony, Appellant was leaning against Jackson's car when the police arrived, and the alcohol "rushed [him]" and he felt intoxicated. (Tr., p. 824.) The boys left the party in Jackson's car with the intention of attending another party on Benita Avenue. Appellant was seated in the front passenger seat. (Tr., p. 417.)

{11} Appellant claimed at trial that he did not remember what occurred at the intersection of Norwood Avenue and Ford Avenue that evening. (Tr., p. 825.) He recalled firing the handgun but stated:

{12} "To be honest with you, I didn't have a reason to really even, you know, expose the weapon. I was -- I wasn't in my right state of mind. I don't know, I was intoxicated. I didn't really think -- I wasn't thinking. I don't know what I was thinking at the time." (Tr., p. 826.)

{13} Appellant testified that he did not intend to hurt anyone and that he did not know any of the teenagers walking on Ford Avenue. (Tr., pp. 827-828.) He claimed that he was aware of the consequences of pointing a gun at someone and shooting at them, but he claimed that is not what he did. (Tr., p. 828.) He said he was aiming the gun "in the air." (Tr., p. 849.) He testified that he regretted taking the handgun with him that evening and experimenting with alcohol and drugs because he "[didn't] know how much it would take to throw [him] off [his] rocks and everything." (Tr., p. 827.)

**{14}** Appellant conceded that he fired every round in the handgun that evening. (Tr., p. 878.) Appellant also conceded that he had to repeatedly pull the trigger in order to continue firing the handgun. (Tr., p. 845.)

**{15}** At the second party, Jackson learned that a girl had died as a result of the shooting and he so informed Appellant, who never left the car at the second party. (Tr., p. 831.) When Appellant returned to his home, he went to the back of the garage to "contemplat[e]" the fact that a girl had died and he may have killed her. (Tr., pp. 830-831.) He says he considered suicide before discarding the handgun behind the garage. (Tr., p. 832.) Appellant testified that he went to sleep hoping to wake up in the morning and discover that no one had died as a result of the previous evening's events. (Tr., p. 833.) A police car was in Appellant's driveway the following morning when he awoke. (Tr., p. 833.)

**{16}** On cross examination, Appellant conceded that he did not divulge the location of the gun when asked by the police, but he claimed that this failure was due to his embarrassment about his suicidal thoughts. (Tr., p. 839.) He appeared reluctant to admit that he had entertained suicidal thoughts at trial. (Tr., p. 871.)

**{17}** All of the teenage witnesses who had been walking from the party testified, and each presented essentially the same testimony. They were walking north on Ford Avenue when they saw Jackson's red car turn onto Ford Avenue travelling southbound, followed by another car. (Tr., pp. 348, 387, 503-504, 521-22.) Someone in Jackson's car called out, "[a]re y'all BBH." (Tr., pp. 349, 387, 503, 521.) Akeem, Green, and Bullock specifically identified Appellant as the person who asked

the question. (Tr., pp. 522, 555, 580.) One of the teenagers responded, "[h]ell yeah." (Tr., pp. 350, 388, 505, 521, 581.) Jackson's car turned right onto Norwood, and shots were fired from the front passenger seat. (Tr., pp. 351, 388-389, 505-507, 555, 580.) Raheem and Hanibol testified that they heard five or six shots. (Tr., pp. 354, 389.) Bullock heard seven shots. (Tr., p. 583.)

{18} Raheem and Hanibol conceded that it is common for party guests to fire handguns up in the air. (Tr., pp. 365, 389.) Green and Bullock both testified they thought, at first, that Appellant was firing his handgun into the air. Green stated that this was his belief until he saw that the handgun was aimed at the group. (Tr., p. 557.) Bullock thought the same until he heard the bullets whizzing past. (Tr., p. 583.)

{19} Raheem testified that the gunman was shooting "[d]irectly at [the students walking on Ford Avenue]." (Tr., p. 373.) Hanibol also felt the bullets fly past him. (Tr., p. 389.) Akeem testified that Appellant was "[a]iming towards [the students] as a crowd." (Tr., p. 524.)

{20} The teenagers scattered when they heard the gunfire. (Tr., pp. 353, 508, 524, 558.) Raheem ran behind a "wall of trees." (Tr., p. 353.) Hanibol ran to an abandoned house. (Tr., p. 391.) Patterson ran for cover behind a tree with McQueen, then twice screamed, "I think I just got shot," and fell to the ground. (Tr., pp. 352, 374, 390, 558.) Akeem was shot in the leg. (Tr., p. 525.) He ran behind a house with Bullock, then Bullock carried him on his back to Saranac Avenue, where friends took Akeem to the hospital. (Tr., p. 525.)

**{21}** Akeem and Bullock both identified Appellant as the gunman when the shooting started. (Tr., pp. 523, 582.) According to Raheem, Jackson's car rode by a second time, and at that point he recognized Appellant as the gunman. (Tr., p. 352.) Green and Bullock also testified that Jackson's car drove past the crime scene a second time. (Tr., pp. 559, 589.) Green testified that as he stood over Patterson's body, Appellant said, "don't run now, Big Boy, or something, I'm going to get you too. Something like that." (Tr., p. 559.)

**{22}** Jackson and Brooks, who were passengers in Jackson's car, both testified at the trial. Jackson testified that Appellant's behavior was "regular" when they left Lora Avenue on their way to the second party on Benita Avenue. (Tr., p. 446.) Jackson said that after he turned onto Norwood Avenue he suddenly "hear[d] sparks flying out of a shotgun, shots." (Tr., p. 421.) The shots were coming from his passenger seat. (Tr., 421.) He could not see the direction in which Appellant was shooting the handgun. (Tr., p. 466.) Jackson also said he did not hear any shouting back and forth between Appellant and the group of students prior to the shooting. According to Jackson, when Appellant was finished shooting he sat back in his seat, and Jackson kept driving. (Tr., p. 424.)

**{23}** Brooks testified that he did hear Appellant yell, "[y]'all BBH" to the students walking on Ford Avenue. (Tr., p. 478.) After the car turned onto Norwood Avenue, Appellant started shooting. (Tr., p. 479.) Brooks did not see the direction of the shots, either, but heard four or five shots. (Tr., p. 480.)

**{24}** They attended the party on Benita, where everyone was talking about the dead girl from the party on Lora. (Tr., p. 429.) Brooks testified that all of the occupants of the car wanted to go home when they heard that Patterson was dead. (Tr., p. 482.)

**{25}** Jackson drove his passengers to their respective homes and then he went to a friend's house, where his friend discovered five shell casings in his car. (Tr., p. 431.) One shell casing was found on Norwood Avenue approximately 135 feet past the intersection of Ford Avenue and Norwood Avenue, and another was found in the driveway of Appellant's house. (Tr., pp. 622-623.)

**{26}** Detective Rick Spotleson was the lead detective assigned to the case. He testified that Hanibol, Green, and McQueen were at the scene when he arrived, and they told him that "Deon" was the gunman. (Tr., p. 674.) He contacted Jackson and made arrangements to meet with him. (Tr., p. 674.) Based on the information provided by Jackson, Spotleson obtained and executed an arrest warrant for Appellant and searched his house. (Tr., pp. 682-683.)

**{27}** Jackson was charged with murder and attempted murder, but pleaded to obstruction of justice and offered his testimony at trial in exchange for the dismissal of the other charges. (Tr., p. 435.)

**{28}** Spotleson interviewed Appellant within ten hours of the shooting. (Tr., p. 684.) He testified that Appellant did not appear to be under the influence of alcohol or drugs, and that Appellant asked him what Jackson had told the police about the events of the previous evening. (Tr., p. 685.) Appellant also asked what a

judge would believe, appeared to claim he did not intend to shoot anyone and asked how much prison time he was likely to get. (Tr., p. 686.)

{29} When the conversation turned to the night of the shooting, Appellant said that he was "mad that day about something. * * * And he said he had to put somebody in line and because of that, he started drinking some energy -- Rockstar energy drink, and according to him he drank a lot of -- a lot, a lot, a lot of Rockstar energy drink* * *." (Tr., p. 688.)

{30} According to Spotleson, Appellant said that he bought the gun for his own protection because "[a] lot of people don't like him for some reason and he had to protect his valuables and himself." (Tr., p. 689.) With respect to the shooting, Spotleson said that Appellant told him that "he was going off the music* * *he was twisted; that he wasn't in the right state of mind; and he was going off the music, listening to the music. He just hung out the window and just started shooting." (Tr., pp. 689-690.)

{31} In this appeal, Appellant contends that he did not act purposely or voluntarily when he fired into the group of teenagers walking on Ford Avenue. R.C. 2903.02(A) reads, in pertinent part, "[n]o person shall purposely cause the death of another * * *." In Ohio, a person is not guilty of an offense unless his conduct includes a voluntary act, and he has the requisite degree of culpability for each element as to which a culpable mental state is specified by the section defining the offense. R.C. 2901.21(A).

**{32}** Involuntary acts are defined by the code as, "[r]eflexes, convulsions, body movements during unconsciousness or sleep, and body movements that are not otherwise a product of the actor's volition." R.C. 2901.21(D)(2). A person acts purposely when it is his specific intention to cause a certain result. R.C. 2901.22(A).

**{33}** Prior to October of 2000, voluntary intoxication was a defense if it was shown to have prevented the defendant from forming the intent necessary to commit the charged offense. *State v. Love*, 7th Dist. No. 02CA245, 2006-Ohio-1762, ¶63. However R.C. 2901.21(C) was amended to read:

**{34}** "Voluntary intoxication may not be taken into consideration in determining the existence of a mental state that is an element of a criminal offense. Voluntary intoxication does not relieve a person of a duty to act if failure to act constitutes a criminal offense. Evidence that a person was voluntarily intoxicated may be admissible to show whether or not the person was physically capable of performing the act with which the person is charged."

**{35}** With respect to the determination as to whether Appellant acted purposely, the trial court provided the following instruction to the jury: "Deadly weapon: If a wound is inflicted upon a person with a deadly weapon in a manner calculated to destroy life, the purpose to cause the death may be, but is not required to be, inferred from the use of the weapon. The inference, if made, rests with you." (Tr., p. 955.)

## ASSIGNMENT OF ERROR I

**{36}** "APPELLANT GLENN'S CONVICTIONS WERE NOT SUPPORTED BY SUFFICIENT EVIDENCE TO ESTABLISH BEYOND A REASONABLE DOUBT THAT APPELLANT GLENN ACTED VOLUNTARILY AND PURPOSELY, ESSENTIAL ELEMENTS TO PROVE MURDER AND ATTEMPTED MURDER IN VIOLATION OF THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT (Transcript, passim)."

**{37}** To determine whether sufficient evidence exists to support a conviction, a reviewing court must determine "whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus. Sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law. *State v. Robinson* (1955), 162 Ohio St. 486, 124 N.E.2d 148. A conviction based on legally insufficient evidence constitutes a denial of due process. *State v. Thompkins* (1997), 78 Ohio St.3d 380, 286-87, 678 N.E.2d 541, citing *Tibbs v. Florida* (1982), 457 U.S. 31, 102 S.Ct. 2211, 72 L.Ed.2d 652.

**{38}** In his first assignment of error, Appellant contends that the random bullet pattern contradicts the jury's finding that Appellant acted with volition and purpose on May 25, 2007. Appellant claims that, "[b]ecause the shots were fired <u>immediately</u> after Jackson's car turned East [the car actually turned west] onto Norwood, there were no obstacles blocking the path between [Appellant] and the group walking. Testimony established that Mr. Jackson was not speeding nor had he

sped up as he turned onto Norwood." (Appellant's Brf., p. 15.) Appellant further argues that, "[d]espite [Appellant's] proximity and the unobstructed path to the group, the record evidenced that the shot pattern was wildly sporadic." (Appellant's Brf., p. 17.)

{39} Three residences contained evidence from the crime scene, 1607 Ford Avenue, 1605 Ford Avenue, and 1603 Ford Avenue. The houses are aligned on Ford Avenue from North to South. (State's Exh. 15.) Spotleson testified that he located a "fresh mark" in the brick of the house at 1607 Ford Avenue that "appeared to be a gunshot" at "eye level." (Tr., pp. 694, 696.) State's Exhibit 35, a photograph of 1607 Ford Avenue, reveals that the "fresh mark" is located on the south side of the house next to 1605 Ford Avenue. A sandal, cell phone, and a pair of eyeglasses were recovered from the tree line area in front of 1605 Ford Avenue. (Tr., p. 619.) A slug was also recovered from the tree line area at 1605 Ford Avenue. (Tr., p. 692.) Another slug was recovered from a second story bedroom at 1603 Ford Avenue. (Tr., pp. 697-699.)

{40} Based on this evidence, Appellant states, "[t]he approximately 2,000 square foot area that [the] slugs were recovered from established that [Appellant's] actions were involuntary and that he never acted to purposely harm anyone." (Appellant's Brf., pp. 17-18.) Appellant also claims that "[t]he record established that [Appellant] was firing his pistol up in the air." (Appellant's Brf., p. 17.)

{41} First, Appellant's argument regarding the trajectory of the bullets ignores the majority of the testimonial evidence offered at trial. Raheem, Akeem, and

Green testified that Appellant was shooting directly at them. Bullock and Hanibol both testified that they felt the bullets whizzing past them.

{42} Second, the testimony of the students established that they scattered when they heard the gunfire, some of them hiding behind trees and another seeking cover behind an abandoned house. Consequently, the jury may have attributed the random shot pattern to the scattering of targets in the midst of the gunfire.

{43} With respect to the argument that there was insufficient evidence to establish that Appellant acted purposely, several of the teenagers testified that he asked them if they were "BBH" before opening fire. There was testimony at trial that animosity existed between BMF and BBH, and Spotleson's testimony established that Appellant was angry on May 25, 2007, and that he had to "put somebody in line." (Tr., p. 688.)

{44} Finally, the jury was permitted to infer from Appellant's use of the handgun that he acted with the purpose to cause death. Based on all of the evidence of record, Appellant's argument that the state failed to support the inference at trial lacks merit.

{45} Viewing all of the evidence adduced at trial in a light most favorable to the prosecution, the jury could have found beyond a reasonable doubt that Appellant acted voluntarily and purposely when he fired the handgun in spite of the disbursement of bullets among the three houses on Ford Avenue. Appellant's first assignment of error is overruled.

## ASSIGNMENT OF ERROR II

**{46}** "APPELLANT GLENN'S CONVICTIONS WERE AGAINST THE MANIFEST WEIGHT OF THE TESTIMONY AND PHYSICAL EVIDENCE PRESENTED AT TRIAL INDICATING THE JURY LOST ITS WAY IN VIOLATION OF SECTION 3(B)(3) , ARTICLE IV OF THE OHIO CONSTITUTION, THUS CREATING A MANIFEST MISCARRIAGE OF JUSTICE (Transcript, passim)."

**{47}** Even though a court of review may find that a verdict is supported by sufficient evidence, it may still be found to be against the manifest weight of the evidence. *Thompkins* at 387, citing *Robinson* at 487. "Weight of the evidence concerns 'the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief.' " (Emphasis sic.) Id., quoting Black's Law Dictionary (6th Ed.1990) 1594.

**{48}** " 'The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.' "

*Thompkins* at 387, quoting *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717.

**{49}** Although Appellant concedes that he may not rely on his voluntary intoxication to prove that he could not form the requisite intent to commit murder and attempted murder, he argues that based on this record he "was intoxicated to the point that he was physically incapable of aiming a gun," and that "[his] physical faculties were not under his control." (Appellant's Brf., p. 25.)

**{50}** Appellant's argument in this record is based on his allegations regarding the effect of the combination of energy drinks, Hennessey, and marijuana at trial. Lack of volition on Appellant's part is raised for the first time on appeal. Because no expert testimony was offered on this issue, Appellant asks us to take judicial notice of several documents attached to his appellate brief. These documents include a list of the ingredients in Rockstar (Appellant's Exh. C), a study on the neuropsychiatric effects of caffeine (Appellant's Exh. D), a study on the popularity and effect of energy drinks on adolescents (Appellant's Exh. E), a study detailing alcohol's effect on the brain (Appellant's Exh. F), and a website that explains the effects of marijuana (Appellant's Exh. G.)

**{51}** It is important to note at the outset that the Ohio jury instruction given in a case where a party asserts that he did not act voluntarily reads, in pertinent part: "Where a person commits an act while unconscious as in a (coma) (blackout) (convulsion) due to (heart failure) (disease) (sleep) (injury), such act is not a criminal

offense even though it would be a crime if such act were the product of a person's (will) (volition)." Ohio Jury Instructions (2010), Section 417.07.

{52} Appellant in this case attempts to circumvent the 2000 amendment to R.C. 2901.21(C) by arguing that his intoxication transformed his otherwise voluntary acts into involuntary acts. However, the comment to the foregoing jury instruction reads, in its entirety, "[u]se above with appropriate instruction on purpose or knowledge. This instruction would not apply to one who recklessly or negligently became intoxicated or drove a car while sleepy." Likewise, the Tenth District rejected a similar effort to argue that, even if intoxication cannot negate the intent requirement, it can negate the volition requirement. *State v. McClaskey*, 10th Dist. No. 05AP-882, 2006-Ohio-6646.

{53} In *McClaskey*, the defendant was convicted of intimidation after he made a series of profanity-laden threats to a police officer while sitting in the back of his patrol car. The defendant, who was intoxicated at the time, was placed in the patrol car while the police officer called a taxi to take the defendant home.

{54} On appeal, the defendant argued that the trial court should have given a jury instruction regarding the "blackout" defense because the defendant was suffering from an alcoholic blackout when he threatened the police officer. The Tenth District held:

{55} "The 'blackout' defense comes from R.C. 2901.21(A), which provides that a defendant cannot be found guilty of an offense unless it is shown that liability is predicated on a voluntary act, and that the defendant had the requisite mental state

to commit the act as specified in the statute that establishes the offense. R.C. 2901.21(D)(2) excludes from the definition of voluntary acts '[r]eflexes, convulsions, body movements during unconsciousness or sleep, and body movements that are not otherwise a product of the actor's volition[.]'

**{56}** "We note that '[v]oluntary intoxication may not be taken into consideration in determining the existence of a mental state that is an element of a criminal offense.' R.C. 2901.21(C). Thus, the mere fact that appellant was intoxicated, standing by itself, would not be sufficient to provide a defense to the charge of intimidation. Instead, appellant's condition would have to rise to the level of unconsciousness before the blackout defense would be available." Id. at ¶10-11.

**{57}** The Tenth District ultimately rejected the argument that the defendant in *McClaskey* was unconscious, because of his active exchange with the police officer.

**{58}** The Fifth District Court of Appeals rejected the applicability of the "blackout" defense in an assault case in *State v. Hackendorn*, 5th Dist. No. 2004-COA-053, 2005-Ohio-1475. The Fifth District wrote:

**{59}** "Here, however, the offense is not one that could be committed as a result of a blackout. No reflexes, convulsions, or other involuntary bodily movements by appellant could be involved in the conduct described by the witnesses consisting of calling the victim a vulgar name, striking the victim causing her to fall on her back, getting on top of the victim and punching her several more times, grabbing hold of her ankle as she attempted to fight him off and pull her back down onto the ground as the victim was struggling and kicking appellant to finally escape. (T. at 64). The

entire assault lasted over two (2) minutes. (Id.). Appellant then fled the scene upon being observed by a neighbor. (Id. at 88-89). Additionally, Appellant presented no medical testimony in support of his affirmative defense to establish that the appellant was in an unconscious state at the time he committed the criminal acts." Id. at ¶43.

{60} After reviewing this caselaw and the record in this matter, we must conclude that Appellant's argument that the manifest weight of the evidence demonstrates that he did not act voluntarily fails for several reasons. First, like the defendants in *McClaskey* and *Hackendorn*, the record of Appellant's behavior on the night of May 25, 2007 does not reflect that he was unconscious. Jackson testified that he was "regular" on the way to the party on Benita Avenue. Several witnesses testified that Appellant called out of the car window to the teenagers before opening fire. Appellant testified that he never got out of the car at the second party, and that he contemplated suicide after discovering that he may have been responsible for Patterson's death. Spotleson testified that Appellant claimed the following day that he had to "put somebody in line." The chain of events described by all of the witnesses and by Appellant, himself, both during and following the events on Norwood Avenue evince conscious action on his part.

{61} Turning to Appellant's judicial notice argument, the facts provided by Appellant in the attachments to his brief are not "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Evid.R. 201(B). Here, Appellant asks us to take judicial notice of a series of documents in order to conclude that the shootings were not a voluntary act.

As the *Hackendorn* Court observed, expert testimony would be required in order to reach such a conclusion in this case.

{62} Insofar as Appellant cannot establish, based on the record before us, that the alcohol and drugs in his system rendered him unconscious, the manifest weight of the evidence supports the jury's verdicts. As stated earlier, Raheem, Akeem, and Green testified that Appellant was shooting directly at them. Bullock and Hanibol both testified that they felt the bullets whizzing passed them. Appellant asked if the teenagers were "BBH" before opening fire. There was testimony at trial that animosity existed between BMF and BBH, and Spotleson's testimony established that Appellant was angry on May 25, 2007, and that he had to "put somebody in line."

{63} Simply stated, the greater amount of credible evidence supports the jury's verdicts in this case. Accordingly, Appellant's second assignment of error is overruled, and Appellant's convictions are affirmed.

Vukovich, J., concurs.

DeGenaro, J., concurs.